from Mr. Pleasance. Good morning, Your Honor. Mark Pleasance. I have Co-Counsel Elizabeth Daugherty and Chris Aberle with me, but I will do the arguing for everyone. In short, as Your Honor indicated, you've read the briefs and the facts of the case. Our position is that the police did not have sufficient grounds to go into this hotel room as they did. In other words, they entered a room without a warrant. I think that's clear in the case. I think tacitly the government admits that they entered illegally without a warrant because they're arguing the independent source doctrine. And I believe the independent source doctrine does not apply in this case, and the evidence should have been suppressed because the government relies on two chief cases for the independent source doctrine, the Murray decision from the Supreme Court and the Segura case from the Supreme Court. And I think it's important when we look at those two cases and the facts of those cases in light of this particular case. Murray was actually a 4-3 opinion. Two judges recused themselves for some reason, so it's more of a polarity opinion. Just factually, though, as I understand it, the officers made an illegal entry into the warehouse, and they observed bales of marijuana. They left and got a warrant and didn't base the affidavit to get the warrant on anything they saw during the illegal entry. And the court said that was okay as long as they would have applied for a warrant anyway, and they didn't rely on anything that they saw during the illegal entry. Am I reading the case right? You are, Judge, and I think the distinction is in this case, the officers stayed in the room during the two-hour period. Well, they went in and searched the room, then they went and got the warrant. In Murray, they just observed, they went in, they observed marijuana, they left, and they came back. I guess the distinction is, Judge Haynes, we don't know, under the facts of our case, what the officers knew or did not know when they applied for the warrant, and I think that's the distinction. Did anything in the room find its way into the application for the warrant? Well, they asked for... The whole point is, did you rely on the illegal entry, and we'll just for the moment assume it's illegal for this discussion, did they rely on anything in getting the warrant? And so tell me what it is that they relied on from the illegal search to get the warrant that was issued here. I think the problem is we can't tell from this case, because, but in the warrant, they asked for all things that were found in the room, for instance, fraudulent checks, printing paper. But the evidence, to get the warrant, you can't just say, I'd like to search somebody's room. Right. You have to have something to convince the magistrate judge that you have a basis to search the room. So you say, I've observed them carrying bales of what look like drugs, we have this confidential informant, you have all these kinds of things that you rely on, you put all that in there, and the magistrate looks at it and says, this is good enough or not good enough. And my question is, is any of that reliant upon something they found in the room? There's nothing in the warrant connecting it to the room. And I think that's part of... And doesn't that end the debate? Well, no. I think that part of it goes to, I personally think it's not a very good warrant. I mean, I don't think there's enough in the warrant for it to have been issued. They only talk about the extrinsic factors in this case, the chasing of the car, the vehicle number, so forth and so on. I guess my point is, how do they know to ask to search and to seize certain items if they didn't pick that up from having been in the room? I guess it begs the question, so to speak. Well, they knew what the scheme was. They had pretty good general information about the scheme. They knew they were picking up these homeless people who, they were getting Cassie's checks. They had seen the check-writing machine and the paper, the blank check. So they knew what the scheme was, and so wouldn't it be logical to think that's what they were looking for? Well, then it begs two questions. Why didn't they get the warrant ahead of time? And then, you know, we wouldn't be here, perhaps. But second of all, I think when you look at the items that were seized, to me they're so particular in some instances that you would not have known that had you not been in the room. Give us an example of what it is you couldn't know from just the overall fraudulent checks. Cell phones, currency. How would they expect to know that there was currency in the room When you write a check to get a false check, that's what you typically get out of it, right? Currency. Cell phones aren't that amazing of an item to search for. People use cell phones in most criminal enterprises and non-criminal enterprises. I mean, I don't, tell me something that man, I can't imagine you would have known about that without seeing it in the room. What is this thing? A cell phone and currency in a check? Well, there are things in the return of the warrant that are not in the warrant. That obviously was not put in the warrant but were seized. That perhaps should have been. That's personally always the case, isn't it? You don't know. I mean, you get a warrant to search for general items and you put in what you think is going to be there, but you're going to likely find some things you didn't know were going to be there. I understand. I just feel it's a problem when the police can go illegally into a room, sit there for hours. Ah, that is true, but the problem is not whether there's a problem. It's whether the remedy of suppression is the right remedy for this problem. I mean, I think you want to file a complaint against these officers and have them go through an internal investigation where I think all that might be very much justified. There are other, in other words, there are other remedies for wrongful conduct by police officers than suppression if, under the independent source doctrine, if this would have been obtained lawfully and was obtained lawfully through the warrant, then do we suppress this evidence and allow these people to go free? Is that the remedy required? Well, maybe it should be because I think you're saying there's other remedies against the stuff like this, and obviously with Murray and Segura, and they look for ways to get around it for, and I understand the law generally is they shouldn't be punished for what they would have essentially gotten anyway. You know, it might have, I mean, it does seem a little strange that you let, bless an illegal entry like this, let them go in. I mean, it'd be subject, I can see some abuses that would follow from this, but we've got to follow what the Supreme Court said, so that's all we can do. Well, I understand, but I think what Murray does is sends the case back for the trial court to do what I think Judge Haynes, you're asking me to do, is to distinguish or parse what information they had when they went to apply for the warrant compared to what they gained from having been in the room. In other words, you said, point out to me what's in the warrant that they found that they would not have . . . Yeah, but now that you're the losing party on an appeal, it's a little different setup, okay? The government needs to prove that, you know, their case of the independent source and all that in the district court, but now you're the losing party on appeal. You have to point to me specifically how the district court erred and not just say, well, send it back and let the district court try again, because I'm not going to have them try again unless they got it wrong the first time. Well, I . . . Because our district courts are busy, and I don't want to be making them try again if they didn't do the wrong thing the first time. Well, I understand. Okay, so you as the appellate advocate here have to point me to what it was that shows me, because you're saying, man, there is no way they could have written this affidavit without what they saw in the room, and I'm saying, point me to that, and all you said was cell phones and currency, which didn't strike me as that exotic. So if you have anything else, you need to bring it to my attention and our attention. I can't point to a specific item. I mean, I'm reading the warrant. I have it right here in front of me, and it talks generally about . . . Obviously, I think what Judge Davis said, things you might, if you've investigated such a crime, find generally types of things, currency, printing paper, computers, and so forth and so on. But I think the thing is, you know, what . . . I think some of it still goes to the intent. What prompted the warrant? Were they going to get the warrant regardless, is what they found in the room prompted them to get the warrant? You know, Murray said, you know, this would not have been the case. The ultimate question is whether the search pursuant to the warrant was, in fact, genuinely independent based on information and tangible evidence. This would not have been the case if the decision to seek the warrant was prompted what they had seen during the initial entry or if information obtained during the entry was presented to the magistrate and affected his decision. Is that a fact question, what their intent was? I think that . . . I think Murray makes it a fact question. Okay. And then what do we know about fact questions on appeal? What's our standard of review? Clear error. Yeah. So what's the clear error in the finding that they were planning to get the warrant? I understand, but I think the fact also, too, is the trial court based its complete reasoning on this case on a totally different doctrine whatsoever. Based on exigent circumstances, never used a considered independent source doctrine. I'll reserve the balance of my time. Don't we have . . . can't we affirm on anything that the record presents, even if it's not the basis that the district court . . . Yes, you can. Okay. Reserve the balance of my time. Didn't the judge in passing at least make a reference to the independent source doctrine? A very vague reference. She cited the Nix case, which did include that language in that case. Thank you. Thank you, sir. Okay, Ms. Domingue. May it please the Court. I'm Camille Domingue, appearing for the United States. Judge Hange, as you pointed out, the issue here is, because of the independent source doctrine, is not the legality of the initial entry, but it's whether there was an independent source for the evidence that was ultimately seized, which, in this case, there was. There was a search warrant that . . . Yeah, but I mean, what about this point that this just seems awfully bold to just stand around in this hotel room for a couple of hours without a warrant. I think the exigent circumstances thing's a little weak. And so, is this the society that the Fourth Amendment contemplates? Well, Segura directly addressed this issue of, does it make a difference that the officers in the Segura case went inside the apartment and hung around for 19 hours, which is a heck of a lot longer than the two hours involved in this case, between the time of the initial entry and the time that the warrant was ultimately signed and executed. And Segura addressed this. And the defendant had argued, well, this is ridiculous. These people sat around for 19 hours. And the Supreme Court says, well, you know, it doesn't really make any difference because we're talking about independent source. And the issue is, under the exclusionary rule, we're not going to apply the exclusionary rule in a way that puts the government in a worse situation. Okay, so is there a remedy? I understand that the argument is that the exclusionary rule is not there, but is there a remedy for these, we'll call them bold police officers, bold law enforcement . . . Well, Judge, I won't . . . And you file a grievance against them. Is there some remedy other than . . . because I am concerned about this sort of abuse of power concept. I think that 42 U.S.C. 1983 would potentially provide a remedy. These were state officers. These were not federal officers. They were Lafayette Police Department officers. I think Section 1983 could provide a remedy. I'm certainly not an expert in that area of the law. You'd have to show that under the settled law at the time, any reasonable officer would clearly know that this was a violation of the Fourth Amendment, which would require a whole different inquiry than what we're talking about today. But, you know, I think the court in Murray, the Supreme Court in Murray, really addressed the incentive issue. There's a discussion in Murray where the Supreme Court addresses an argument raised by the defendants that, you know, gosh, this whole independent source thing, this creates bad incentives for police officers to just do whatever they want as long as they later can go to a judge and get a clean warrant based on information that doesn't appear in the affidavit. You know, isn't this just going to cause police officers to violate everyone's rights? And the Supreme Court rejected that. And there's an interesting discussion in Murray talking about incentives, that if an officer has probable cause to believe that there's evidence, if he has probable cause to get a warrant, he's not going to recklessly risk screwing that up by entering illegally and then having to increase his burden later on by explaining to a district court, like the one in this case, you know, that he intended to get the warrant in the first place, that what he observed on premises didn't motivate his decision to get the warrant. He's not going to do that, because that's going to make things harder for him. You know, what concerns me is an officer may have a very probable cause, but he may think, look, you know, I can probably get a warrant, but whether it's worth fooling with this case, can I prove it? So after they go in there and they see the evidence, then they know they can prove it. So that gives them a much more incentive to then go get a warrant. And in that case, because the district court did not explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse. Now, we don't have a finding like that here either, do we? No, no, Your Honor. There's no explicit finding. The district court in this case basically ruled its primary ground for upholding the search was that exigency justified the entry. And I believe for that reason the court felt like it didn't have to go any further, although it does, as you pointed out when counsel was up at the very end, the court does make this reference, citing Nix, saying that even if the evidence found or seized was seized in violation of the Fourth Amendment, exclusion of the evidence is not warranted because the prosecution proved by preponderance of the evidence that the police would have obtained the evidence if no misconduct had taken place, citing Nix. And that's the second page of the district court's ruling. And I would suggest to you that this is different from Murray, and I understand Murray involved a remand. This is different from Murray because implicit in the district court's ruling on exigency, and that's the long, detailed part of its ruling, is the notion that the exigency was, well, we have to preserve this evidence because the traffic stop is going to alert, or could potentially alert, the people in the hotel room that the police are going to come to them. And so the whole idea was that the whole purpose of the entry was to secure the scene because of the exigency created by the surveillance being made. So implicit in that is that we've got to secure the scene while we get a warrant, meaning the entry, lawful or not, was completely motivated by, you know, a desire to secure the scene while a warrant was being obtained. And, you know, I think that that implicit finding is clearly supported by the record. When the agents and the officers testified, they talked about, I think they were specifically asked, why were you doing the surveillance? Why did you care about the surveillance? And the answer was, we wanted to identify the people in the car so that, because we thought that, you know, that might help us in getting the warrant. So the plan from the beginning, or at a very early stage, was to get a warrant to search this hotel room. But they wanted to continue the surveillance so that they could get more information. And, you know, one of the things that counsel mentioned is, well, you know, they could have gotten a warrant earlier. Well, this court and the Supreme Court, in fact, has rejected the idea that, you know, the police have to get a warrant at the earliest possible opportunity. You know, the reality of police work is, once you execute a search warrant, the jig is up. I mean, everybody knows the police are on to you. And as the police are following this car around town, and they're seeing them go to, you know, try to solicit people to cash checks, you know, there's a legitimate purpose to that. The government or the police were not, you know, orchestrating something to permit them to do an illegal search. They were doing legitimate police work to try to shore up their warrant. Now, on the issue of whether any of the information that they're—anything they observed during the entry, lawful or unlawful, was used in the affidavit, Judge Haynes, you asked counsel a lot of questions about this. And I think you can clearly look at the affidavit, and you can see that in the factual assertions, there's nothing. There is absolutely no reference to anything that was observed in Room 206. There's one sentence that talks about, quote, a dual takedown of the occupants in the car and the occupants in the room. Doesn't talk about what was observed, seen in either place. Under this Court's opinion in Runyon 2, you could technically excise that. It wouldn't affect the finding of probable cause. So the— Couldn't Murray counsel against a blessing, a search, unless they're—based on the independent source doctrine, unless there's an explicit finding that the police would have sought a warrant without the illegal entry? I think if you're—that is—that's one of the things that's required. And in Murray, there was a remand so that the district court could make express findings on that. I did find, in preparing for argument yesterday, an unpublished decision of this Court, Bryan—I'll provide the Court with a citation in a 28J letter. And in Bryan, this Court distinguishes Murray on the remand issue and says, you know, in remand—in Murray, the Supreme Court found that the inference supported by the evidence was just not strong enough. But, you know, we can, as you pointed—or I think Judge Weiner, as you pointed out, the Court of Appeals can affirm on any basis supported by the record. All that's required is a finding, not necessarily a finding in writing. And as I've suggested, implicit in the Court's exigency ruling is this finding that the whole purpose for the entry, lawful or not, was to secure the evidence pending getting a warrant. So it was like, you know, we go into the room so we can secure it while somebody else is getting a warrant. Are you saying there is a find—an implicit find— Yes. —for getting the warrant? That's my argument. I thought they were securing the room until that stop was made, not securing the room until they got a warrant. It was the other way around, Judge. If you look at the record, the officer testifies that as soon as he heard over the radio that the traffic stop had been made, that's when they went into the room. The idea being, we're going to make the traffic stop because the surveillance has been detected. That's the problem. That's the exigency. The surveillance has been detected. We're going to make the traffic stop because these guys are onto us. And then Morgan, I think is his name, was the police officer, a supervisor who was in the operation back at the police department. He says, you know, if we're going to stop the car, we're going to need to secure that room because all it's going to take—and he explained this at the hearing—all it takes is one text message, one quick phone call in the instant, you know, that the lights go on when the car is pulling over the—or when the police are pulling over the car and the lights go on. All it takes is an instant for somebody to send a text message, police got us. Shred it. Get out of there. You know, and that was the exigency. So the record evidence is that the decision to make the traffic stop was based on the surveillance being made. That prompted the decision to enter the room to secure it. And, you know, no search was made. They secured it. There was a man and a woman in one bedroom. Then Killeberger shows up while they're all there. They get those people out of there, take them down to the station. And then two officers sit there for The last thing I did want to address on this is the notion of whether the application for the warrant relied on things that the officer observed merely because of the description of the property to be seized. And I think, Judge Davis, the point you made is the one that I would make as well, that the description of the property to be seized really flows from the nature of this offense. And it's not specific to anything, as Judge Haynes said, exotic that would have been observed by any of these officers in the room. You know, keep in mind that you already had an October 15th stop. What happened on the 27th, which is when we had the entry in the room, was phase two of this criminal escapade. You already had a traffic stop on the 15th where the officers, pursuant to a consent search that is not challenged on appeal, found a printer, blank check stock. Then they go to the hotel, or another set of officers, independent, this is one of these sort of sometimes we get lucky in police work, go to the hotel on an independent drug activity report, and they find the same guy. He gives a consent search. That time we find checks. We find checks that are in the names of other businesses. They had found a computer in the car during the consent search of the vehicle stop. So when you look at the description of the property, all documents, equipment used to produce cash fraudulent checks, to include but not limited to printing paper. They found printing paper in the car. Checks. They found checks during the consent search. Account numbers. Account numbers are on the checks. Printers. They found that in the car. Copiers. Banking records. U.S. currency, as you said, if you have fake checks, you're cashing them in order to get currency. Any and all electronic devices, that's a very general description. We know, or they knew, that this counterfeiting operation used computer equipment. Because remember, they had talked to two of the check cashers who had been recruited, who said, well, you know, I gave them my ID, and they immediately had a check. You do that with a computer. They knew that we were talking about a computer-operated venture and not somebody that was washing legitimate checks. To include but not limited to computers, cell phones, external hard drives, and thumb drives. All of those things, I mean, this is, I'm going to call it boilerplate. I mean, this would basically be boilerplate that you would use in this type of investigation. As for the return, of course, the return is done after the search warrant is executed. So you would expect that there would be things on the return that they would have observed during the execution of the search. That's the entire purpose for the return. Mr. Domingue, let me ask you this. How soon after the stop was made did the process begin for getting the warrant? Do we know that from the record? We don't have that in terms of minutes. We know that the entry into the hotel room happens at 1154. That's essentially undisputed. We know that the search warrant was signed by a State District Court judge in Lafayette at about 203-204, something around there. At what? 203-204. So it's about a little more than two hours later. And the testimony in the record, the issue on the entry in the hotel room comes up twice, once in the motion to suppress and the second time at trial. And, of course, this Court, in reviewing the District Court's ruling on the motion to suppress, can look at the testimony from both aspects of the case. So the detective who was the affiant, Trina Broussard, testified that she was with the She had been at the hotel trying to find out who these people are, where, you know, who's got the room. The hotel wouldn't give them the room without the subpoena, so somebody goes to get a subpoena. She's at the hotel when the initial entry is made at 1154. Then she leaves to go and go back to her office to start typing out the affidavit. I can't, I don't think, to my recollection, the record doesn't reflect minutes, whether it was five minutes, ten minutes, a minute and a half. But we do know that the entire process from entry to the warrant was a little over two hours. I remember the entry was the same time the car was stopped, right? Exactly. The record reflects that the car was stopped at 1154. As soon as Morgan heard over the radio that the car had been stopped, he told the people at the hotel, go into the hotel room. And they knocked on the door, nobody answered, and the hotel clerk had given them the key, and they used the key to go in. As soon as they heard the command, go in, and that happened after the traffic stop. Was there any communication between the officers in the room and the officer seeking the warrant before the warrant was obtained? Well, as I said, the affiant on the warrant was at the hotel, so she would have been there at the time the entry was made. And I think she says something like, I was there when they walked. I can't remember her exact words. I'm not sure if that meant she physically walked in the room with them or she was in the lobby. I think it's clear from the record that the officer, Trina Broussard, who is ultimately the affiant on the search warrant affidavit, was physically at the hotel at the time the entry was made. I don't think it's clear, to my recollection, and I'll stand corrected, whether she was physically in the hotel room, was one of the ones who made the entry. In any event, none of it ends up in the search warrant affidavit, which is what's important under Murray, Segura, this Court's decisions in Runyon II and Grosenheide. Was she the one who made the decision to get the warrant? No. The record reflects that that decision was jointly made by Todd Borrell, who was sort of the lead detective in this investigation. He was the one that, from the very beginning, had read about the traffic stop on the 15th and had seen some other activity and kind of put two and two together. So that's Borrell. And then Morgan, who was the captain at the police department, who's sort of in charge of the whole operation. He's a supervisor. I think their testimony was the decision to get the warrant was a joint decision between the two of them. And if the members of the Court have no further questions, I'll return the rest of my time to the Court. Thank you. Thank you very much. Okay, Mr. Palazios? I think remand is proper because, well, Murray dictates I think it's proper, because it says that this Court should not infer or look in the record to see if there's any inference as to whether or not the officers would have applied for the warrant, regardless of the fact that they went in the room. In fact, Murray specifically says, which there's no indication of in this Court, that the agents did not reveal their warrantless entry to the magistrate and did not include in their application for the warrant a recitation . . . I thought you said that was in the affidavit, that they had the takedown in the affidavit,  Well, there's a sentence at the end that said that there were people in the room, that it was a coordinated dual takedown, but that's . . . it doesn't go any further than that. But that tells the magistrate what happened, right? I mean, it's not hiding it from . . . Well, it doesn't necessarily tell me that they went in the room and stayed there for at least 30 minutes. No, but a takedown is different from hiding the . . . it's saying we did a takedown at the room and the car is different from hiding from the magistrate that you've done anything in that regard, right? I mean, how would you construe the word takedown? They simultaneously conducted two operations at once, but it doesn't tell me, as a magistrate, that they were . . . the occupants were seized in the room. In other words, they could have got them walking out the door. I'd like more facts. I just don't think there's enough facts. But it's not hiding it. I mean, the magistrate could ask. When you go and get the warrant, the magistrate can ask questions or can say, I don't have enough information. What is this takedown? Go explain that. Go do a further affidavit or explain to me or whatever, right? And I think that's why I initially told you, I think the warrant is kind of sketchy in my opinion. But I think Murray says that. Murray says that the inference is not clear for the appellate court to make the conclusion that the district court needs to hear specific testimony on this. What was the testimony on this? Well, the testimony was about the exigent circumstances, talking about the fact that, you know, and I find it hard to . . . I thought they said they planned to get the warrant. Well, they planned to get a warrant, yes. They never said when they planned to get a warrant, to my recollection. And to answer your question, Judge Davis, I think the record around page 686 or 687 talks about that Officer Broussard was in the room for about 30 minutes before she left to get the warrant. So there's a lot of unanswered questions, I think, especially when you're going to argue independent source doctrine as compared to the exigent circumstances. And although, yes, you can find for any reason in the record, but I don't think you can in this case because by not addressing the proper legal ground, the trial court was not able to ascertain the proper set of facts to support the decision or for this court to make that decision. You don't think even if the evidence found or seized was seized in violation of the Fourth Amendment, exclusion of the evidence is not warranted because the prosecution proved by preponderance of the evidence that the police would have obtained the evidence of no misconduct had taken place. You don't think that's sufficient? I don't think that's sufficient in this case under these facts. Did you all object in any way to the lack of findings and lack of detail of the judge? I don't recollect it being in the record. I'll submit the case unless there's any more questions. All right. Let's see. We had some convictions under Section 514. I think everybody agrees we need to vacate those. Is that right? We certainly agree. Yeah. Nicely done. All right. We appreciate the government agreeing with us on that. Thank you very much. Thank you.